**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JASON KERNS; ARCHIE KERNS;
MARY ANN KERNS,

         Plaintiffs - Appellees,

v.

Albuquerque Police Department
Officers DREW BADER; MATT
THOMPSON; RUSSELL CARTER, in
their individual capacities,

         Defendants - Appellants,

and

BOARD OF COMMISSIONERS OF
BERNALILLO COUNTY; Bernalillo
County Sheriff DARREN WHITE, in
his individual and his official
capacity; Bernalillo County Sheriff's
Detectives BRIAN LINDLEY;
RALPH GONZALES; JAMES
HAMSTEN, in their individual
capacities; Bernalillo County Sheriff
Deputies LAWRENCE KOREN;
SEAN CONNORS; AARON
WRIGHT; TIMOTHY HIX; RHONDA
MOYA, in their individual capacities;
THE CITY OF ALBUQUERQUE;
Albuquerque Police Department
Officers ROBERT JOHNSTON;
JAMES MONTOYA, in their
individual capacities; Metropolitan
Forensic Science Center Firearm and

No. 09-2273
(D.C. No. 1:07-CV-00771-JB-ACT)
(D.N.M.)

Tool Mark Examiner MIKE HAAG, in his individual capacity; JOHN DOES 1-10, in their individual capacities,

Defendants.

----------------------------------------

JASON KERNS; ARCHIE KERNS; MARY ANN KERNS,

          Plaintiffs - Appellees,

v.

BOARD OF COMMISSIONERS OF BERNALILLO COUNTY; BERNALILLO COUNTY SHERIFF DARREN WHITE, in his individual and his official capacity; BERNALILLO COUNTY SHERIFF DETECTIVE BRIAN LINDLEY; BERNALILLO COUNTY SHERIFF DEPUTY, LAWRENCE KOREN,

          Defendants - Appellants,

and

BERNALILLO COUNTY SHERIFF'S DETECTIVES RALPH GONZALES, and JAMES HAMSTEN, in their individual capacities; SEAN CONNORS, AARON WRIGHT, TIMOTHY HIX, and RHONDA MOYA, in their individual capacities; THE CITY OF ALBUQUERQUE, ALBUQUERQUE POLICE DEPARTMENT OFFICER DREW BADER, MATT THOMPSON, RUSSELL CARTER, ROBERT

No. 10-2103
(D.C. No. 1:07-CV-00771-JB-ACT)
(D.N.M.)

- 2 -

JOHNSTON and JAMES MONTOYA, in their individual capacities; METROPOLITAN FORENSIC SCIENCE CENTER FIREARM AND TOOL MARK EXAMINER MIKE HAAG, in his individual capacity; and JOHN DOES 1-10, in their individual capacities,

Defendants.

------------------------------------------------

MIKE HAAG; JASON KERNS; ARCHIE KERNS; MARY ANN KERNS,

Plaintiffs - Appellees,

v.

METROPOLITAN FORENSIC SCIENCE CENTER FIREARM AND TOOL MARK EXAMINER MIKE HAAG, in his individual capacity,

Defendant - Appellant,

and

BOARD OF COMMISSIONERS OF BERNALILLO COUNTY, BERNALILLO COUNTY SHERIFF DARREN WHITE, in his individual and his official capacity; BERNALILLO COUNTY SHERIFF'S DETECTIVES BRIAN LINDLEY, RALPH GONZALES, and JAMES HAMSTEN, in their individual capacities; BERNALILLO COUNTY SHERIFF DEPUTIES LAWRENCE KOREN, SEAN

No. 10-2106
(D.C. No. 1:07-CV-00771-JB-ACT)
(D.N.M.)

- 3 -

CONNORS, AARON WRIGHT,
TIMOTHY HIX, and RHONDA
MOYA, in their individual capacities;
THE CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE
DEPARTMENT OFFICERS DREW
BADER, MATT THOMPSON,
RUSSELL CARTER, ROBERT
JOHNSTON and JAMES MONTOYA,
in their individual capacities; and
JOHN DOES 1-10, in their individual
capacities,

        Defendants.

Stephanie M. Griffin, Assistant City Attorney, City of Albuquerque Legal
Department, Albuquerque, New Mexico, and Daniel J. Macke, Robles, Rael &
Anaya, P.C., for Defendants-Appellants.

Marc M. Lowry, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenberg &
Bienvenu, LLP, Albuquerque, New Mexico, for Plaintiffs-Appellees.

Before **O'BRIEN, HOLLOWAY,** and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Do we have to decide a qualified immunity appeal involving close
questions of law that the district court hasn't yet addressed? Do the police violate
a suspect's clearly established rights by requesting his hospital records? And do
authorities have probable cause to arrest a trained marksman who makes

suspicious statements in the wake of a shooting, who leads officers on a high speed chase, and who has a recently concealed rifle shell casing lying at the bottom of his trash can?  We answer no to the first two questions and yes to the last.

I

On a summer evening in 2005 a sniper shot down a police helicopter over Albuquerque.  When the authorities reached the scene, one man stood out.  His name was Jason Kerns.  Mr. Kerns was quick to tell the police that he was watching the helicopter from his backyard when it went down — and that he had heard a loud, ear-ringing pop just to his left and the sound of rocks kicking up nearby.  In response to this information, SWAT and K-9 units canvassed the area Mr. Kerns described.

They soon noticed that something seemed amiss when they reached Mr. Kerns's house:  a door was ajar, music was playing, no lights were on.  Things took an even darker turn when the officers noticed a broken window.  A silver-dollar-sized hole punctured a window of the house, with shattering concentrically outward.  This, the police thought, might be the result of a gunshot — perhaps by the same sniper who had just fired on the police.

Concerned that an armed suspect might be hiding inside (perhaps even holding hostages), three officers — Bader, Thompson, and Carter — attempted to make contact with the occupants of the house.  No one answered their repeated

knocks. Finding a side door unlocked, Officers Bader, Thompson, and Carter announced and entered. Inside they soon encountered Mr. Kerns's girlfriend, Michelle Zisser, who hadn't heard their knocks. One of the officers explained that he was looking for a possible shooting suspect and was concerned the suspect might be hiding somewhere inside. Ms. Zisser agreed to let them look around. The police did a quick sweep, everything appeared to be in order, and they soon left. Indeed, it later turned out that the broken window had been caused by an errant golf ball some time before.

As police continued to investigate, it seemed to them that some of Mr. Kerns's statements didn't add up. He told police that he had heard a loud clap when the helicopter went down. But none of his neighbors reported hearing anything like this. He told police that rocks kicked up nearby at the same time. But the police couldn't find a rock bed anywhere near the location Mr. Kerns described. Deputy Lindley learned that Mr. Kerns had served in the military as a helicopter mechanic and marksmanship instructor. Deputy Lindley also learned that Mr. Kerns had been trained to hit man-sized targets up to 2100 feet away — and could likely hit a helicopter-sized target at a much greater distance. For his part, Mr. Kerns estimated that the helicopter had been less than 1000 feet away from his house when it was shot down.

Later interactions with Mr. Kerns only made him appear more suspect in the authorities' eyes. In a written statement, he admitted that he had been looking

at the helicopter and had been "annoyed" by it. He bragged to Deputy Lindley that he would have been able to "make that shot" with "no problem." He added that he had trained to take shots at even greater distances. Deputy Lindley prodded Mr. Kerns a bit, asking him whether someone near Mr. Kerns's house would have been able to see the helicopter from that angle. Not missing a beat, Mr. Kerns replied that he had been able to see the helicopter just fine, and the way it was backlit made it "a great target." He even explained how the helicopter's red strobe lights gave him an indication of the helicopter's flight path.

Later, detectives attempted to follow Mr. Kerns in an unmarked car. It wasn't long before Mr. Kerns noticed he was being tailed and began to drive over one hundred miles per hour in an admitted attempt to lose the trailing car. As he later explained, he thought he was being followed by police and "if they're just watching now, I'm not gonna make it easy for anybody." Aplt. App. at 215. He also told investigators that he suffered from Post Traumatic Stress Disorder (PTSD), and that being followed by an unmarked police car had triggered a negative reaction. He declined to tell police, however, what other situations might prompt his PTSD.

Eventually, the Bernalillo County Sheriff's Department executed a warrant to search Mr. Kerns's home for weapons and ammunition. They found plenty of both, as well as a silencer, military literature, and several high power rifles they

thought capable of downing a helicopter. One rifle in particular, a Fabrique Nationale Model 30.06 bolt-action rifle ("FN rifle"), captured their attention. As part of the search, police also examined the trash outside Mr. Kerns's home. There they found something else curious: a spent rifle shell wrapped in tape and buried at the bottom of the trash can. Mr. Kerns said the shell was an old one he found while cleaning his garage. But analysis of the tape showed that it was fresh, neither dry nor dirty. All this suggested to police that someone had attempted to conceal the shell and had done so recently.

While these events were unfolding, Sheriff White began to question whether Mr. Kerns could lawfully possess weapons at all. Given Mr. Kerns's admission that he suffered from PTSD, Sheriff White decided to investigate whether he had ever been adjudicated to have a mental defect and so unable to possess firearms under 18 U.S.C. § 922(g)(4). In aid of his effort, the Sheriff sent a letter to the local Veteran Affairs hospital, where Mr. Kerns had received psychiatric treatment, asking for "any and all records possessed by the VA pertaining to [Mr. Kerns's] psychiatric condition as it would apply to 18 U.S.C. [§] 922(g)(4)." Aplt. App. at 308. A few days later the hospital voluntarily complied.

Meanwhile, other investigators sought to learn more from the wreckage of the helicopter. They evaluated the apparent trajectory of the bullet through the helicopter to determine where the bullet had come from, and they retrieved a few

fragments of the bullet itself. Though these fragments were badly mangled, a forensic expert, Michael Haag, told investigators that the bullet *could* have come from Mr. Kerns's FN rifle but not his other high powered rifles. Mr. Haag also concluded that the FN rifle fired the spent cartridge retrieved from Mr. Kerns's trash.

Another investigator, Deputy Koren, was able to retrieve GPS data from the crashed helicopter. Using this data, he estimated the direction the helicopter was facing at the time it was hit and calculated that the aircraft was about 1670 feet from Mr. Kerns's house. Deputy Koren also combined the entry angle of the bullet with an approximation of the helicopter's altitude at the time of the shot to determine how far away the shooter would have been from the helicopter. Putting this information together, and performing a bit of trigonometry, he estimated the shooter had fired from a distance of about 1630 feet.

Based on all this, Deputy Lindley prepared an affidavit in support of an arrest warrant for Mr. Kerns. In the affidavit, Deputy Lindley explained how Mr. Kerns was a former military marksmanship instructor trained to hit man-sized targets 2100 feet away. The Deputy noted that, by Mr. Kerns's estimate, the helicopter was less than 1000 feet away at the time it went down. He reported that Mr. Kerns had bragged he could have hit the helicopter with "no problem" and that it was "a great target." He recounted how Mr. Kerns had made what seemed to be a questionable statement — that he'd heard a loud noise and rocks

kick up to his left, even though none of his neighbors reported hearing anything like this and no rock bed could be found in the location Mr. Kerns described. The Deputy also wrote of Mr. Kerns's suspicious behavior, how he had raced at over one hundred miles an hour in an attempt to lose following detectives. And he reported that a search of Mr. Kerns's home had yielded several firearms (including the FN rifle); boxes of ammunition; at least one silencer; and a spent shell casing, freshly wrapped in tape and buried in a trash can.

Deputy Lindley's affidavit also included the results of Koren and Haag's forensic work. The affidavit explained that, based on Deputy Koren's calculations, the shooter had been about 1630 feet from the helicopter. Deputy Lindley noted that this was within the range of the FN rifle — and that the distance from where the helicopter was hovering to Mr. Kerns's house was approximately 1670 feet. Finally, Deputy Lindley reported that the bullet fragment taken from the helicopter could have been fired by the FN rifle.

In light of all this information in Deputy Lindley's affidavit, an arrest warrant was issued and Mr. Kerns was arrested. A few days later, Mr. Haag and another witness presented much of the same information to a federal grand jury that soon indicted Mr. Kerns.

But then things took a turn. A forensic expert hired by Mr. Kerns found that Mr. Haag's ballistics report was sorely mistaken — and soon Mr. Haag admitted that Mr. Kerns's FN rifle could *not* have been the one that shot the

helicopter. Deputy Koren's trajectory analysis came into question as well, with competing expert testimony suggesting the shooter had only been 939 feet away, and that the bullet may not have come from the direction of Mr. Kerns's home. In light of these developments, the U.S. Attorney dismissed the charges against Mr. Kerns.

It was then these lawsuits followed, proceeding in three essential movements. First, Mr. Kerns sued Officers Bader, Thompson, and Carter under 42 U.S.C. § 1983, alleging they had violated his Fourth Amendment rights by briefly entering his house on the night of the crash. Second, he sued Sheriff White, arguing the Sheriff's efforts to obtain his psychiatric records violated his Fourth and Fourteenth Amendment privacy rights. Finally, he accused Deputy Lindley, Deputy Koren, and Mr. Haag of false arrest, false imprisonment, and malicious prosecution. All the defendants moved for summary judgment on the basis of qualified immunity, but the district court denied relief, and the defendants now appeal.[1]

II

---

[1] Mr. Kerns acknowledges that a district court's denial of summary judgment on grounds of qualified immunity is subject to immediate review when the issues appealed are ones of law. But he cautions us that the defendants' arguments sometimes seem to him to be rooted in disputed factual issues which are not subject to interlocutory review. We proceed mindful of this constraint on our jurisdiction and limit the scope of our inquiry to *legal* challenges to the court's denial of qualified immunity. *See Lewis v. Tripp*, 604 F.3d 1221, 1225-26 (10th Cir. 2010).

- 11 -

We begin our analysis with Officers Bader, Thompson, and Carter, each of whom insists he is entitled to qualified immunity for his role in the search of Mr. Kerns's house on the night of the crash. Law enforcement officers are, of course, entitled to a presumption that they are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs. "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." *Lewis*, 604 F.3d at 1230.

A plaintiff can overcome this presumption of immunity only by carrying the heavy burden of showing both that (1) the defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity such that "every reasonable official would have understood that what he [was] doing" violated the law. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080, 2083 (2011) (internal quotation marks omitted). Failure on either qualified immunity element is fatal to the plaintiff's cause.

In fact, the Supreme Court has recently instructed that courts should proceed directly to, "should address only," and should deny relief exclusively based on the second element, *Camreta v. Greene*, 131 S. Ct. 2020, 2032 (2011), in seven particular circumstances outlined in *Pearson v. Callahan*, 555 U.S. 223, 236-42 (2009) — namely when (1) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (2) "it

appears that the question will soon be decided by a higher court"; (3) deciding the constitutional question requires "an uncertain interpretation of state law"; (4) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify"; (5) tackling the first element "may create a risk of bad decisionmaking" due to inadequate briefing; (6) discussing both elements risks "bad decisionmaking" because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (7) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *See also Morgan v. Swanson*, 659 F.3d 359, 385 (5th Cir. 2011) (en banc).

With respect to the last consideration, constitutional avoidance, the Supreme Court has told us that courts may "avoid avoidance" — and so answer the first qualified immunity question before proceeding to the second — in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is required and the conduct is only likely to be challenged within the qualified immunity regime. *Camreta*, 131 S. Ct. at 2031 & n.5. But the Court has also told us that this should be the exception, not the rule — that as a general matter, constitutional avoidance considerations trump and "courts

- 13 -

should think hard, and then think hard again, before turning small cases into large ones." *Id.* at 2032.

Before the district court the officers argued that Mr. Kerns's claims fell short on both aspects of the qualified immunity test. They argued that the exigent circumstances posed by the nearby shooting of a police helicopter, coupled with Mr. Kerns's own statements, justified their fear that a shooter might be hiding out in his home, perhaps even holding hostages. At the least, they insisted, these circumstances justified their brief incursion before they won consent from Ms. Zisser. And even if they did somehow violate the Fourth Amendment, the officers added, they did not violate *clearly established* Fourth Amendment law. *See* Aplt. App. 90-94. In his opposition to summary judgment, Mr. Kerns understood both prongs of the qualified immunity analysis to be in play and proceeded to explain his view that the officers violated his Fourth Amendment rights, *id.* at 151-56, as well as why our precedent clearly established that their conduct violated those rights, *id.* at 148-51. Though the dissent rightly notes the question is close, it ultimately accepts that both aspects of the qualified immunity test were placed in play by the parties before the district court.

Despite this, however, the district court did not analyze the clearly established law element. Instead, the court held *only* that the defendants had *actually* violated Mr. Kerns's Fourth Amendment rights, and from this holding it proceeded directly to the conclusion that they were not entitled to qualified

immunity. In other words, the district court's opinion addressed only the *first* part of the *two* part test for qualified immunity.

What to do when the district court fails to address the second, clearly established law, element? If it were clear that no constitutional violation took place, as the defendants urge, we might simply reverse the district court and grant qualified immunity. But the answer to that question isn't so clear in this case. Faced with *that* problem we usually do well — as *Pearson* and *Camreta* remind us — to proceed directly to the clearly established law question when we're sure it yields immunity anyway. But there again the answer isn't so obvious in this case. So it is that we are left in a situation without obvious answers to either qualified immunity question and risk confronting difficult constitutional questions without the benefit of a full analysis from the district court.

In these circumstances, there remains, however, another course available to us — remanding the matter back to the district court to finish the work of answering the second qualified immunity question. *See Distiso v. Town of Wolcott*, 352 F. App'x 478, 482 (2d Cir. 2009) (unpublished) ("When a district court gives only cursory treatment to the immunity defense, [we] will remand to the district court with instructions to give further consideration to the matter.") (internal quotation omitted). That course bears the advantage of allowing the adversarial process to work through the problem and culminate in a considered district court decision, a decision that will minimize the risk of an improvident

governing appellate decision from this court. And that course is especially prudent where, as here, the issue is close and the briefing on appeal less than entirely satisfactory. Indeed, many of the same considerations that *Pearson* and *Camreta* identify as counseling in favor of proceeding directly to the second qualified immunity element — the possibility of avoiding a needless constitutional question, the quality of briefing, and the desire to avoid the risk of a poor decision — also counsel in favor of remanding to ensure the district court addresses the second element before we begin to tangle with a case on appeal. And it is for these very reasons that we reserve decision on both aspects of the qualified immunity question in this case until after the district court, on remand, has finished its work on the clearly established law prong.

Our dissenting colleague proceeds to reach the questions we think prudent to defer, offering views on both prongs of the qualified immunity analysis. He does so in part because he reads the district court's opinion as having already addressed the clearly established law question in two passages. We regret we are unable to agree. First, the dissent cites the *background* section of the district court's order where it simply recites the familiar two prong qualified immunity test without *applying* it to this case. *See* Aplt. App. at 217. We don't doubt the district court exhaustively recited the second qualified immunity question. The problem is the court didn't proceed to answer it. Second, the dissent points to a single sentence in the district court's self-described "analysis" section (a single

sentence out of a four page section).  But that sentence says simply this:  "The Kerns[es] have a Fourth Amendment expectation of privacy in their own home that is well-established.  *See Payton v. New York*, 445 U.S. at 585."  *See* Aplt. App. at 220.  By its own terms, that sentence doesn't purport to issue any holding on the second qualified immunity question.  It does not, for example, state that the officers *violated* the clearly established right it identified or explain *how* they did so.

But even if the dissent's reading were correct and the district court's formulaic statement of a general legal proposition was intended as a holding on the clearly established law question, it is simply inadequate to that task.  Of course, Mr. Kerns (like everyone else) has a well-established privacy interest in his home.  But the Supreme Court and we have explained that, when it comes to deciding the second qualified immunity question, it is "not enough to look at," and declare a law enforcement officer liable, based on such "generalized principles."  *Medina v. City and County of Denver*, 960 F.2d 1493, 1497-98 (10th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)).  The Supreme Court vigorously underscored the point recently, reminding us with some apparent exasperation that it has "repeatedly told courts . . . not to define clearly established law at a high level of generality.  The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is

- 17 -

clearly established." *Ashcroft*, 131 S. Ct. at 2084 (internal citations omitted). Instead, for any court to reach a determination that a violation of clearly established law has taken place a "more particularized" inquiry is required. *Anderson*, 483 U.S. at 640. The court must ask whether "every reasonable official would have understood that *what he [did]* violate[d] that right." *Ashcroft*, 131 S. Ct. at 2083 (emphasis added) (quotation omitted). To satisfy this standard, "[w]e do not require a case directly on point," but neither may a district court deny immunity unless "existing precedent [has] placed the statutory or constitutional question *beyond debate*." *Id.* (emphasis added).

The relevant question the district court needed to address, thus, wasn't whether we all have some general privacy interest in our homes (of course we do). It was instead whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification. In addressing this question the district court needed to address the officers' claim that exigent circumstances existed (based on a belief that someone who had just shot down a police helicopter might be hiding in or near the home) and their claim that their intrusion was justified in part because of the consent Ms. Zisser supplied (at least after the incursion was first made). And *these* questions the district court simply left unanalyzed.

III

We turn next to the case against Sheriff White. Before the district court, Mr. Kerns argued that the Sheriff violated his clearly established Fourth and

Fourteenth Amendment rights by asking the VA hospital to share its records concerning Mr. Kerns's treatment. To be exact, Mr. Kerns didn't argue that he *owned* the hospital records. *See* Daniel J. Gilman & James C. Cooper, *There is a Time to Keep Silent and a Time to Speak, the Hard Part is Knowing Which is Which: Striking the Balance Between Privacy Protection and the Flow of Health Care Information*, 16 Mich. Telecomm. & Tech. L. Rev. 279, 309 (2010) (explaining that health care providers generally own patient records). Neither did he seek to hold anyone liable for violating state or federal statutes seeking to ensure some degree of privacy in patient records. *See, e.g.*, Health Insurance Portability and Accountability Act (HIPAA), Pub. L. 104-191, 110 Stat. 1936 (1996). Instead, Mr. Kerns submitted only that, whoever owned the records and whatever other laws may say about how and when they might be shared with law enforcement, he had a constitutionally protected expectation that the hospital would keep its records shielded from the Sheriff absent a warrant.

The district court analyzed both aspects of the qualified immunity test before agreeing. On appeal, the Sheriff disputes whether he violated Mr. Kerns's constitutional rights by asking a hospital to share its records voluntarily — and, if he did, whether those rights were clearly established at the time. Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on

important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

We begin with Mr. Kerns's Fourth Amendment claim, because it provides the more "explicit textual source of constitutional protection" against law enforcement searches. *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quotation omitted). At step two of the qualified immunity analysis, the question before us is whether Mr. Kerns can show that Sheriff White's request to a third party (the hospital) for records that it may own but in which Mr. Kerns claims a privacy interest (an interest which we accept exists for our purposes at step two) violated clearly established Fourth Amendment law as of 2005.

He cannot. In *Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005), this court accepted that a patient has a privacy interest in medical records held by a third party medical services provider. At the same time, however, the court proceeded to explain that statutes requiring disclosure of those records to "law enforcement" may not always violate the Fourth Amendment. *Id.* at 1102 n.3. And then, in language directly pertinent here, the court added that the question whether, in the absence of such a statute, "a warrant is required [for law enforcement] to conduct an investigatory search of [medical] records [held by a third party] . . . is an issue that has not been settled." *Id.* at 1103. Given this court's express recognition of the uncertain state of the law in 2005 regarding the very circumstances we now

face, we are hardly in a position to say that the proper resolution of the issue was simultaneously beyond doubt. *See also Herring v. Keenan*, 218 F.3d 1171, 1173 (10th Cir. 2000) (recognizing "a constitutional right to privacy" in medical records but granting qualified immunity because no clearly established law put defendant on notice that his conduct violated that right).

Complicating the Fourth Amendment analysis in this case is the role of third party doctrine. Under that doctrine, "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by [the third party] to Government authorities, even if the information is revealed [to the third party] on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443 (1976). The Supreme Court has already applied third party doctrine to financial information, holding that the government may seek without a warrant confidential information clients have entrusted to their banks for safe keeping. *Id.* And at least some courts have indicated the same analysis applies to personal medical records entrusted by patients to hospitals or care providers — allowing law enforcement to seek without a warrant medical records held by third parties. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.7(d) (4th ed. 2004) (collecting authority). While there's certainly room to debate whether and how third party doctrine should apply to medical records, *see, e.g.*, Poornima L. Ravishankar, Comment, *Planned*

- 21 -

*Parenthood is Not a Bank: Closing the Clinic Doors to the Fourth Amendment Third Party Doctrine*, 34 Seton Hall L. Rev. 1093 (2004); *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) (declining to extend *Miller* to ISP records), and while we in no way prejudge these questions, the fact that a live (and heated) debate exists on them is more than enough to preclude us from saying that the Sheriff violated clearly established law when he sought records held by a third party care provider.

In an effort to shoulder his burden of showing otherwise, Mr. Kerns depends principally on *Ferguson v. City of Charleston*, 532 U.S. 67 (2001). But in that case the Supreme Court expressly declined to answer the question posed in this one. *Ferguson* held that state hospital employees conducted an unlawful search in violation of the Fourth Amendment by taking urine samples from pregnant mothers without their consent in order to test them for cocaine and provide the results to law enforcement for use against the patients. *Id.* at 77, 84-85. In reaching its result, the Court took care to emphasize that the *only* search at issue was the taking and testing of urine for police use. *See id.* at 78 n.13. The Court expressly *left open* whether disclosure of preexisting medical records held by the hospital would also be a search implicating the Fourth Amendment. *Id.* at 77 n.9. In fact, the Court even acknowledged that in some situations a patient might well "expect that members of the hospital staff might turn over evidence" without his or her consent. *Id.* at 78 n.13. And after the Supreme Court

remanded the case to the Fourth Circuit, that court, too, held only that the hospital's nonconsensual "taking and testing" of urine for law enforcement purposes was an unlawful search, and again expressly declined to decide "whether the disclosure of test results to law enforcement also implicate[s] the Fourth Amendment." 308 F.3d 380, 395 (4th Cir. 2002). According to the terms of *Ferguson* itself, then, it hardly placed the Fourth Amendment question before us beyond debate. Underscoring our conclusion, Professor LaFave has explained that *Ferguson* cannot be taken as having "disapprov[ed] of the result in cases" applying third party doctrine to medical records and finding no Fourth Amendment violation where (as here) a law enforcement officer seeks medical records held by third party care givers. LaFave, *Search and Seizure* § 2.7(d).[2]

Turning to the Fourteenth Amendment, the same sort of problems recur. In *Douglas*, this court examined Fourteenth as well as Fourth Amendment case law before concluding that a warrantless request for third party-held records did not violate clearly established law as of 2005. 419 F.3d at 1101-03. And, again, we

---

[2] Alternatively, Mr. Kerns directs us to a pair of Tenth Circuit cases in aid of his Fourth Amendment claim. First, he finds hope in *Lankford v. City of Hobart*, 27 F.3d 477 (10th Cir. 1994), where this court said "it is possible" a Fourth Amendment violation had occurred under somewhat similar circumstances. *Id.* at 480 n.2. For its part, the dissent also relies extensively on *Lankford*. *See* Dissent at 19-21. But whatever else one wants to say about that decision, its language hardly announced "clearly established law." At best, *Lankford*'s equivocation *declined to foreclose* the possibility of a Fourth Amendment violation. Likewise, we reject Mr. Kerns's suggestion that the out-of-circuit *concurrence* in *United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980), clearly established that Sheriff White's conduct was unlawful.

are hardly able to say otherwise now. It is also unclear whether and to what degree the Fourth Amendment's third party doctrine might — or might not — also inform the parameters of a patient's Fourteenth Amendment's privacy interest in third party medical records. *See, e.g.*, *Lewis*, 523 U.S. at 841 (noting that the Supreme Court is "reluctant to expand the concept of substantive due process . . . where a particular Amendment [like the Fourth already] provides an explicit textual source of constitutional protection") (quotation omitted).

Confirming the lack of a clear answer here, most of the Fourteenth Amendment cases Mr. Kerns cites involve state actors who *publicly disclosed* a citizen's private information, not law enforcement officers who requested the voluntary production of records held by a third party for use in legitimate law enforcement efforts.[3] And the Supreme Court in *Whalen v. Roe*, 429 U.S. 589 (1977), a case which Mr. Kerns seeks to rely upon, suggested a meaningful constitutional difference may exist between these situations, indicating that access by the government without a concomitant public disclosure "does not automatically amount to an impermissible invasion of privacy." *Id.* at 600, 602.

---

[3] *See, e.g.*, *A.L.A. v. West Valley City*, 26 F.3d 989, 990 (10th Cir. 1994) (considering claims arising from "*disclosure* of [] confidential medical information") (emphasis added); *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1155 (10th Cir. 2001) ("interest in avoiding *disclosure* of personal matters") (emphasis added) (quotation omitted); *Flanagan v. Munger*, 890 F.2d 1557, 1570 (10th Cir. 1989) ("[T]he constitutional right to privacy protects an individual's interest in preventing *disclosure by the government* of personal matters.") (emphasis added); *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986).

Repeating the point last term, the Supreme Court revisited *Whalen* and held that the government's mere collection of information didn't violate an assumed privacy interest when the information was sufficiently protected against public disclosure. *See NASA v. Nelson*, 131 S. Ct. 746, 761-62 (2011).

To be sure, Mr. Kerns cites two cases in which this court held that government officials violated plaintiffs' substantive due process privacy rights by accessing their records without public disclosure. But both of those cases involved another element not present here: the government officials involved accessed the plaintiffs' confidential information as part of an unlawful campaign of sexual harassment.[4] Obviously, that situation isn't present here; there is no dispute that Sheriff White was pursuing what was an otherwise lawful investigation. Neither is this point of distinction clearly immaterial. The cases on which Mr. Kerns relies are consistent with the logic of the common law privacy torts — accessing confidential medical information for the purpose of sexual harassment is exactly the sort of "highly offensive" conduct that might give rise to the tort of intrusion upon seclusion. *See* Restatement (Second) of Torts § 652B (1977). Meanwhile, it's less than clear that an officer's requesting a

---

[4] *See Lankford*, 27 F.3d at 478; *Eastwood v. Dep't of Corr.*, 846 F.2d 627, 629-30 (10th Cir. 1988). These cases are explicitly directed at "protecting employees' private information from being obtained by their employers *without a valid reason.*" *See Lankford*, 27 F.3d at 479 (emphasis added); *Eastwood*, 846 F.2d at 631 (10th Cir. 1988) (the Fourteenth Amendment "protects the individual from governmental inquiry into matters in which it does not have a legitimate and proper interest").

suspect's medical records for legitimate law enforcement purposes would meet this same standard. *Cf. Setzer v. Farmers Ins. Co., Inc.*, 185 F. App'x. 748, 755 (10th Cir. 2006) (unpublished) (insurance company's conduct was not "highly offensive to a reasonable person" when the company made a general request for medical records with consent for a disclosure of only limited information). Our cases simply don't speak to that question, let alone do so clearly.

Of course, a case on point isn't required if the impropriety of the defendant's challenged conduct is clear from existing case law. If we could be sure that the distinction between public disclosure or government access without a valid purpose, on the one hand, and more limited government access for otherwise legitimate purposes, on the other, is a trivial one we would rule in Mr. Kerns's favor. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("general statements of the law are not inherently incapable" of satisfying the second prong of the qualified immunity test) (quotation omitted). The difficulty is that the Supreme Court in *Whalen* and *NASA* and the logic of our own cases preclude such a conclusion and acknowledge instead that such a distinction *might* make a constitutional difference.

The dissent eloquently argues that if the scope of Mr. Kerns's Fourth and Fourteenth Amendments rights in third party held medical records isn't clear enough then we should use this case to address the matter definitively. But to voice this argument is to confirm that the issue we confront today *hasn't* yet been

clearly resolved — and why qualified immunity is unavoidable. The Supreme Court has warned us that small qualified immunity appeals are rarely the right place to decide large new issues of constitutional law. We always do well to abide its warnings. And perhaps especially so here, where the Fourth and Fourteenth Amendment questions surrounding medical records are complex, the third party overlay adds another dimension to the problem, the parties' briefing unhelpfully skates past many of the important issues, and the lack of clearly established law is readily apparent from our case law and that of the Supreme Court. So it is we leave the bigger questions for another day and today rest our decision on a much humbler premise, reversing the district court's entry of summary judgment against Sheriff White and ordering the entry of summary judgment in his favor only because Mr. Kerns has failed to identify clearly established law rendering beyond debate that the Sheriff's conduct was unlawful as of 2005.[5]

IV

Finally we turn to Mr. Kerns's false arrest, false imprisonment, and malicious prosecution claims against Deputy Lindley, Deputy Koren, and Mr. Haag. Although these torts require Mr. Kerns to prove a variety of different

---

[5] Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (*e.g.*, through motions to suppress wrongly seized records or claims for injunctive or declaratory relief).

elements, and although defendants pursue various qualified immunity arguments in their respective appeals, there is at least one piece of common ground. To prove any of his claims, Mr. Kerns acknowledges he must establish that his arrest and detention were without probable cause. And, in the defendants' view, this he cannot do because whatever mistakes, omissions, or misstatements they may have made in connection with the arrest warrant affidavit or in grand jury proceedings, there was still probable cause to arrest and detain him during the period of his prosecution. With this much we agree, and we proceed to uphold the defendants' claim of qualified immunity on this basis because doing so turns out to be the easiest and most economical way to resolve their various appeals. *See Pearson*, 555 U.S. at 236 ("[T]here are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong.").

Procedurally we approach the probable cause question this way. Where false statements are alleged to have been *included* in an arrest warrant affidavit or grand jury testimony, "probable cause is determined by setting aside the false information and reviewing the remaining" truthful facts. *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996). Similarly, where true information has been allegedly and unlawfully *omitted* from an affidavit or grand jury proceeding, the existence of probable cause is determined "by examining the affidavit [or proceedings] as if the omitted information had been included and inquiring if the

affidavit [or proceedings] would still have given rise to probable cause." *Id.* (internal quotation omitted); *see also Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996).

Substantively, the question whether probable cause existed in light of the — so defined — factual record does not require proof beyond reasonable doubt. It does not even require the suspect's guilt to be "more likely true than false." *Texas v. Brown,* 460 U.S. 730, 742 (1983); *see also United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011). Instead, the relevant question is whether a "substantial probability" existed that the suspect committed the crime, *Taylor*, 82 F.3d at 1562, requiring something "more than a bare suspicion." *Ludwig*, 641 F.3d at 1252 (quoting *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999)).

Evaluated using this technique — striking the allegedly false information and inserting the allegedly truthful but omitted information — and in light of this substantive standard — requiring more than a bare suspicion but not proof beyond a reasonable doubt or even a preponderance — the affidavit and grand jury testimony still featured sufficient evidence to warrant Mr. Kerns's arrest and detention.

We begin with what *was* included in the affidavit and *isn't* challenged by Mr. Kerns before this court. Mr. Kerns admitted to police that he was looking at the helicopter and "annoyed by it" at the time it was shot. He was trained both as a military marksmanship instructor and as a helicopter mechanic. He bragged to

police that the helicopter made "a great target," that he could have "made that shot," and that the helicopter's strobe lights had given him an indication of the helicopter's flight path. Mr. Kerns behaved suspiciously from the night of the shooting straight through to his arrest. At one point he led detectives on a high speed car chase. (It is true that the police were in an unmarked vehicle and Mr. Kerns admitted only after his arrest that he suspected the car belonged to the police all along, but the police (understandably) thought the behavior suspicious at the time it occurred.) At other points he gave questionable statements to police — no one else reported hearing a gunshot near his house, and police never found the rocks Mr. Kerns said he heard kicking up next to him. And even granting, as Mr. Kerns contends, that Mr. Haag should have excluded the FN rifle and with it the spent shell casing in the trash as the one responsible for downing the helicopter, it is uncontroverted that the tape concealing the casing was fresh and new — again suggesting that Mr. Kerns was attempting to hide something peculiar.

All this taken together was enough to give police substantial if not incontrovertible reason to believe that Mr. Kerns was responsible for the shooting. Indeed, other courts have found probable cause in circumstances analogous in various ways to those presented by this case. *See, e.g.*, *United States v. Mills*, 280 F.3d 915, 921 (9th Cir. 2002) (defendant's dubious statements about presence near remote crime scene and officer's knowledge of defendant's

criminal history sufficient for probable cause to arrest); *Tom v. Voida*, 963 F.2d 952, 958-59 (7th Cir. 1992) (discussing flight as a "relevant and probative factor" in probable cause analysis and holding that flight from an officer "may certainly provide information to ripen an officer's preexisting suspicions into probable cause"); *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 127 (2d Cir. 2009) (unpublished) (probable cause to arrest for shooting where officer heard shots suddenly fired, saw individual standing alone in the direction where the shots were fired, individual immediately turned around and proceeded in the direction from which the shots had come); *Young v. Renico*, 346 F. App'x 53, 58-59 (6th Cir. 2009) (unpublished) (probable cause to detain defendant suspected for murder of his wife and son where police had information suggesting defendant's motive and defendant had told doctors to immediately remove his son from life support after learning of his condition); *see also Johnson v. Schneiderheinz*, 102 F.3d 340, 341-42 (8th Cir. 1996) (evidence that suspect was in vicinity of the murder and had lied to police about other details created at least "arguable" probable cause to arrest). Neither does Mr. Kerns identify any contrary authority that would lead us to reject a finding of probable cause in light of all the appropriately included facts.

Instead, Mr. Kerns asks us to focus on facts that the affidavit and grand jury testimony *omitted*, insisting that including those facts would have ruled him

out as the shooter — even in light of the facts the affidavit properly contained. And this, he says, is the case for two reasons.

First, he argues (as does the dissent) that if the defendants had disclosed the true location and heading of the helicopter it would have been clear that the shot couldn't have come from his backyard. But none of this is necessarily exculpatory. It only does Mr. Kerns any good if he can show he *was* in his backyard at the time of the shooting. But the only evidence of *that* comes from Mr. Kerns's self-interested statements. And by the time of his arrest Mr. Kerns had already proved himself unreliable through a variety of misleading and contradictory statements and actions — statements and actions outlined in the arrest warrant affidavit and grand jury testimony. Including the omitted information about the track of the helicopter, thus, would have done nothing to negate the probable cause that already existed.

Second, Mr. Kerns says that, if Mr. Haag had followed the standards of his profession, he would have excluded the FN rifle as the one that shot down the helicopter — and the inclusion of this fact in the arrest warrant affidavit or grand jury proceedings would have negated probable cause to support his arrest and detention. But the difficulty with this line of argument is that nothing in the probable cause analysis we have set forth or the precedents we have discussed depends on the discovery of the weapon responsible for the crime. Even if the police had said that the FN rifle wasn't involved in the shooting, sufficient *other*

evidence existed to provide probable cause to think Mr. Kerns was the shooter, including Mr. Kerns's boasting about being able to hit the helicopter, his background, his many questionable statements, and his evasion of police. Each of these facts was known to the officers and does not require any speculation on their behalf. Indeed, probable cause to arrest often arises from circumstantial evidence when the weapon responsible for the crime cannot be found or identified, as the precedents cited above illustrate and confirm.

The existence of probable cause disposes of all of Mr. Kerns's claims against all three defendants. For its part, the dissent disagrees with us about the existence of probable cause, but it doesn't grapple with the authority we've cited or offer any of its own. And it proceeds to deny qualified immunity to all three defendants without pausing to address the clearly established law question. To be sure, the dissent appears very concerned by the fact that Mr. Haag's ballistic analysis and Officer Koren's trajectory analysis seem to have been faulty and perhaps even recklessly so. And, to be equally clear, we share that concern. Of course and emphatically, when assessing the existence of probable cause we must exclude such false or reckless information and include any suppressed material exculpatory information. But we have done exactly that and the fact remains, at the end of the process, enough truthful information existed in the arrest warrant

and grand jury proceedings to establish probable cause. And because of that we remain obliged by law to extend qualified immunity.[6]

\* \* \*

The district court's order denying qualified immunity with respect to Mr. Kerns's Fourth Amendment claim against Officers Bader, Thompson, and Carter, is vacated and that matter is remanded for further proceedings consistent with the guidance provided above. The district court's order denying qualified immunity with respect Mr. Kerns's claims against Sheriff White, Deputy Lindley, Deputy Koren, and Mr. Haag, is reversed and the court is directed to grant dismissal to these defendants on the basis of qualified immunity. We have no occasion to reach the defendants' other arguments as to why they should be entitled to absolute or qualified immunity. Similarly, Deputy Lindley's and Deputy Koren's argument that the district court ruled on their summary judgment motion prematurely is mooted by our reversal in their favor.

---

[6] Mr. Kerns (but not the dissent) suggests that the U.S. Attorney's decision to drop criminal charges against him after Mr. Haag admitted error proves that probable cause depended on Mr. Haag's testimony. But this conflates two logically different questions. A prosecutor's decision not to proceed to *trial* where proof beyond a reasonable doubt is required does not necessarily prove that a prior *indictment* lacked probable cause. Separately, Mr. Kerns notes that Deputy Lindley's affidavit overstated the certainty that the recovered bullet fragments were consistent with ammunition found in Mr. Kerns's house. But he doesn't argue that this statement was actually false, and the link between Mr. Kerns's ammunition stash and the bullet fragments is, again, unnecessary to establish probable cause.

Nos. 09-2273, 10-2103, & 10-2106, Kerns v. Bader

**HOLLOWAY**, Circuit Judge, dissenting:

I am unable to join the majority's holdings and so must respectfully dissent. I agree with the majority that we have jurisdiction to review the legal issues in these appeals.

### I.  *Appeal No. 09-2273*

### A

In this, the first of these related appeals, the Appellants are Officers Bader, Thompson, and Carter (the Officers), three Albuquerque police officers.  The claims against these Officers were brought by Jason Kerns and his parents, Archie Kerns and Mary Ann Kerns (Plaintiffs).  Plaintiffs sought damages against the Officers under 42 U.S.C. § 1983 for violation of their Fourth Amendment right to be free of unreasonable searches.  This claim arose from the Officers' entry in the Plaintiffs' residence on the night of the helicopter crash.

I would affirm the district court's denial of the Officers' motion for summary judgment sought on grounds of qualified immunity.  The district court held that a jury could find that there was no imminent threat that would justify the Officers' entry into the Plaintiffs' home.  The Officers' only argument on appeal is that there were exigent circumstances, which under established law would have justified their intrusion into the home.

Because our review is limited to questions of law, it is not necessary to enlarge on the majority's summary of the facts, even though the majority seems to

have strayed at times from viewing the facts in the light most favorable to Plaintiffs as we are constrained to do in the posture of this appeal.[1] It is sufficient to note that the district court held that the jury would have to decide if a reasonable officer would have perceived that an imminent danger existed that would justify the entry. We do not have jurisdiction to review that holding in this interlocutory appeal. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995).

The Officers do attempt to frame their argument as a legal issue. They contend that the district court erred in its application of the legal standards enunciated in *United States v. Najar*, 451 F.3d 710 (10th Cir. 2006). But in fact their argument rests on rejection of the district court's holding that the jury must decide questions of fact pertaining to whether a reasonable officer would have perceived an immediate need to protect himself or others under the circumstances. And as noted, that holding is not reviewable in this interlocutory appeal.

The Officers do not contend that their entry into the home was justified on any other basis. Therefore, if exigent circumstances did not exist, the Plaintiffs' Fourth Amendment rights were violated by the Officers' entry into their home. I thus do not understand the majority's assertion that there is no easy answer to either of the two questions involved in the qualified immunity analysis. On the

---

[1]The existence *vel non* of exigent circumstances is a mixed question of fact and law. *See United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992). The ultimate question whether the facts as found by the jury meet the legal standard of exigency is a question of law. *Id.*

-2-

facts as we must take them, *i.e.*, that Plaintiffs produced sufficient evidence in the district court to support a possible jury finding in their favor on the underlying factual questions, the answer to the first question surely is easy: An entry into the home is unlawful when there is neither a warrant nor probable cause and when the purported exigency is not one that would cause a reasonable officer to believe that someone inside the home was either an imminent threat to others or was herself in imminent danger.

**B**

I disagree with the majority's assertion that the district judge did not address the second prong of the qualified immunity analysis (the clearly established right prong). First, I note that the Officers made only the slightest gesture towards raising the issue concerning a clearly established right in the district court. Indeed, to show that the issue was raised, the majority is only able to point to a single sentence in a sub-heading of the Officers' summary judgment briefing. There, the Officers made only a conclusory assertion that the Plaintiffs had not shown the violation of a clearly established right.[2] I am willing to agree that this was sufficient to raise the issue. But I highlight this point to underscore that the district court's concise treatment of the issue is completely unsurprising in light of the Officers' failure to make any reasoned argument on the issue.

_____

[2]The primary focus of the Officers' argument both in the district court and on appeal is that their conduct was lawful under the recognized exigent circumstances exception to the Fourth Amendment.

In spite of the fact that the Officers had merely referred to a general principle rather than making a reasoned argument, the district judge nevertheless prefaced his analysis with a thorough discussion of the applicable law. First, the judge assessed what is meant by a clearly established right, Aplt. App. 217, and then moved on to discuss the law to be applied to Plaintiffs' claims in this case. After quoting the Fourth Amendment, the judge noted the applicable principles of Fourth Amendment law: For a search without a warrant to be valid, it must fall within a recognized exception to the warrant requirement; searches within the home without a warrant "are presumptively unreasonable";[3] the home is entitled to the greatest protection under the Fourth Amendment;[4] and the government bears the burden of proving that the exigency exception to the warrant requirement applies, a burden which is "especially heavy when the exception must justify the warrantless entry of a home."[5] As the district judge then proceeded to apply the Fourth Amendment principles to the evidence submitted by the parties, he prefaced that analysis with the assertion that the Plaintiffs "have a Fourth Amendment expectation of privacy in their own home that is well-established." Aplt. App. at 220. Each of these statements of the governing legal principles is beyond dispute, of course.

---

[3]*Payton v. New York*, 445 U.S. 573, 586 (1980).

[4]*Kyllo v. United States*, 533 U.S. 27, 31 (2001).

[5]*United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006).

-4-

The district court merely held that, depending on what facts are found by the jury, the Officers may have entered the Plaintiffs' home when no reasonable officer would have perceived any imminent danger to anyone. Such an entry would violate the clearly established law that the district judge had surveyed.

I disagree with the majority's view that the district judge's analysis was inadequate because it was based only on generalized principles. Some cases do indeed require a more particularized inquiry. This is not one of them. As discussed more fully in Part II-B of this dissent, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Thus the majority is incorrect to say that the district judge did not address the second prong of the qualified immunity analysis. The question is not a difficult one in my view, and so I disagree with the majority's decision to remand the matter to the district court to rule again on this strictly legal question. The Officers had neither a warrant nor probable cause. If the circumstances they encountered did not support a reasonable belief that danger to someone was imminent, then the armed, nighttime entry into the home violated clearly established Fourth Amendment law. The district judge's ruling denying summary judgment for the Officers should be affirmed.

Even if I were otherwise in agreement with the majority in this first of these appeals, I would still disagree with its formulation of the issue to be

addressed by the district court on remand. Maj. op. at 18. The majority states the issue with a myopic focus on the facts of this case, apparently inviting the district court to indulge in, rather than avoid, a "scavenger hunt for prior cases with precisely the same facts."[6] Moreover, the majority's statement of the issue it would have the district court address suffers from other flaws. The majority's reference to the Officers' "belief" that exigent circumstances existed should not deter the district court on remand from correctly focusing on whether a reasonable officer would have believed that exigent circumstances existed (an issue which, as I have said, must in this case be resolved by the jury).

The majority's assertion that the district court must consider the Officers' "claim that their intrusion was justified in part because of the consent Ms. Zisser supplied (at least after the incursion was first made)" is surprising because the Officers have not made this contention on appeal. More importantly, the majority's instruction to the district court that it should consider this is very problematic because the issue appears to be one that the district court on remand in the summary judgment stage must resolve against the Officers. Ms. Zisser testified that she was unaware of the Officers until they had already crossed the threshold. Obviously being unaware of their entry, she did not consent to it. Encountering armed officers inside the home in the middle of the night, Ms. Zisser did not tell them to leave immediately. The district court noted that Ms.

---

[6]*Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

Zisser had stated (presumably in her deposition) that "she did not feel she could deny the officers' request [to look around inside the house], as they had their weapons displayed." Aplt. App. at 213-14. Barring a concession by the Plaintiffs that Ms. Zisser's consent was voluntarily given, which seems most unlikely given her testimony, I believe that in its reconsideration of the Officers' motion for summary judgment, the district court must regard the Officers' continued presence in the home as being without consent.

## II. *Appeal No. 10-2103*

This appeal is brought by Sheriff White, Deputy Lindley and Deputy Koren. The claims against White, Lindley, and Koren were brought only by Jason Kerns. The issues raised by Sheriff White are, however, quite distinct from those raised by Deputies Lindley and Koren. The issues raised by the latter two are in fact related to the issues raised in the third of these three related appeals and accordingly will be addressed in Part III of this dissent.

## A

I must respectfully dissent from the majority's decision to reverse the district court's proper denial of Sheriff White's motion for summary judgment sought on qualified immunity grounds. The claim against Sheriff White is based on the Sheriff's role in acquiring Jason Kerns's medical records from the

Veterans Administration.[7]  Because I would affirm the district court's ruling

denying Sheriff White's motion for summary judgment, I would necessarily

address both prongs of the qualified immunity defense.

Jason Kerns served in our military.  Like far too many others, he apparently

came home from his service only to experience difficulties adjusting to civilian

life.  Without examining the confidential medical records that are the subject of

his claim against Sheriff White, we do not know what caused him to seek

psychiatric treatment at his local Veterans Administration Hospital, nor do we

know more than that he was diagnosed as suffering from post-traumatic stress

disorder.  We do know, or in any event his attorney tells us and our precedents

require us to assume, that his treatment involved disclosure to his caregivers of

intimate details of his personal life.

In the course of investigating the crash of the Albuquerque police

helicopter, Sheriff White apparently learned that Jason Kerns had told an officer

that he had post-traumatic stress disorder.  Sheriff White thus thought it *possible*

that Kerns's mere possession of firearms might be illegal, owing to the fact that

Mr. Kerns's voluntary treatment for post-traumatic stress disorder suggested the

---

[7]References in this dissent to "Jason Kerns's records" are made merely for convenience, not to address the irrelevant question of whose property interests are involved.  This case is not about title to personal property but about the constitutionally privileged information contained in the records.  Thus, I use the phrase "Jason Kerns's records" as an abbreviated reference to the protected information contained in those records.

possibility, although not the likelihood, that he had been committed to a mental institution or adjudicated a mental defective.[8]  Acting on this possibility,[9] Sheriff White requested from the VA hospital, by letter, "any and all records" relevant to Mr. Kerns's "psychiatric condition as it would apply to 18 U.S.C. [§] 922(g)(4)." And for some reason the Sheriff decided to seek information from the VA rather than from the courts, where public record of any such adjudication or involuntary commitment would have been found (as any competent law enforcement officer undoubtedly would have known).[10]  In response to his letter, the Sheriff's deputy received Jason's entire medical file from the VA.  Every intimate detail that Jason had reported to his caregivers under a presumption of confidentiality was relayed to the Sheriff's deputy for his perusal.[11]

---

[8]This part of the investigation clearly was not directly relevant to the helicopter crash under investigation.  Instead, it was an effort to determine whether a different offense had been committed.  While I do not question that such an inquiry is legitimate police work, if properly undertaken, in the context of a warrantless search it is relevant to the constitutional analysis whether law enforcement's need for the information was urgent.

[9]Sheriff White argued unsuccessfully in the district court that his quest for Jason's medical records was supported by probable cause.  On appeal, he does not repeat that argument, nor does he even assert that the quest was supported by reasonable suspicion.  I conclude therefore that at this stage of the litigation, we must assume that the quest was based on nothing more than speculation.

[10]The VA records yielded no indication that either had occurred.

[11]A presumption of confidentiality was reasonable and in accord with traditional professional restrictions.  A modern version of the ancient Hippocratic Oath states the physician's duty of confidentiality in these terms:  "I will respect
(continued...)

*Sheriff White undertook to obtain all of Jason's records,*[12] *in spite of their privileged nature, without consent, without a warrant or any other judicial process, in the complete absence of exigent circumstances, and without probable cause; his request was based only on his suspicion that a crime might have been committed.*[13] *If constitutional privacy protections mean anything at all, this conduct violated Plaintiff's right of privacy.* As discussed *infra*, I believe that this is so obvious and so solidly grounded in existing law that a reasonable public official should have known that this intrusion into the Plaintiff's privacy was unlawful. Because the violation of Mr. Kerns's constitutional rights must be discussed in that context, I will forgo further elaboration of my views on that point and turn to the majority's decision to avoid deciding whether a constitutional violation occurred here.

I strongly believe that the majority's decision to avoid the question whether the Plaintiff's rights were violated is unwise. In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Court held that lower federal courts have the discretion to address

---

[11](...continued)
the privacy of my patients, for their problems are not disclosed to me that the world may know." Peter Tyson, *The Hippocratic Oath Today*, Public Broadcasting Service, http://www.pbs.org/wgbh/nova/body/hippocratic-oath-today.html (March 27, 2001).

[12]The Sheriff's letter requested the VA to produce "*any and all* records" relevant to Jason Kerns's psychiatric condition. (Emphasis added.)

[13]See n.9, *supra*.

-10-

only the second or "clearly established right" prong of the qualified immunity analysis, abrogating its holding in *Saucier v. Katz,* 533 U.S. 194 (2001). Nevertheless, even as the Court removed the requirement for the lower courts to address first whether a constitutional violation had occurred, the Court went on to explain that there remain sound reasons for addressing the first prong in many cases. *Pearson*, 555 U.S. at 236. This is such a case.

As the Court noted more recently, "our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo." *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011). Dismissing cases on the second prong of the qualified immunity analysis "thus may frustrate the development of constitutional precedent and the promotion of law-abiding behavior." *Id.* (internal quotation marks omitted). The Court also cautioned there that lower courts should avoid turning small cases into large ones, as the majority notes in discussing the first of these three appeals. But this case does not present that danger because the answer to the first question is so patent.

On the other hand, however, the majority insists that this is a contentious, complicated question. The obvious implication is that the Sheriff's conduct here might have been lawful. In other words, even though the majority is willing to "accept for our purposes at step two" that Jason Kerns has a protected privacy

-11-

interest in the very personal information contained in his medical records,[14] that protection may mean nothing in the face of a request from law enforcement for access to that very personal information. That implication should be closely scrutinized.

Suppose that Sheriff White had decided to investigate the legality of Jason Kerns's gun ownership by checking court records. This would have been a logical thing to do, of course, since the question was whether Jason Kerns had been adjudicated a mentally defective or involuntarily committed, *i.e.*, committed by court order, to an institution for psychiatric care. If the Sheriff had elected to pursue that course, he could have expected to encounter no obstacles, for court records are publicly available. He would not have needed a warrant, nor would he have needed to show Jason Kerns's consent to his request for the information. There would have been no need for him to have shown probable cause or even reasonable suspicion.

In saying that the question whether a constitutional violation occurred is a complicated, difficult one that ought to be avoided in the actual circumstances presented here, the majority implicitly suggests that the law may treat Sheriff

---

[14]Maj. op. at 20. The majority seems almost reluctant to accept that Mr. Kerns has a privacy right. This is odd because this is a principle that several of our cases have recognized, *see, e.g., A.L.A. v. West Valley City*, 26 F.3d 989, 990-91 (10th Cir. 1994) ("There is no dispute that confidential medical information is entitled to constitutional privacy protection."), and is not contested by the Sheriff in this litigation.

White's acquisition of constitutionally protected, highly personal information the same way it would have treated his acquisition of information that may be readily obtained by the general public. In other words, information that has long been held to be protected by the Constitution may in fact not be protected at all but may be as readily available to law enforcement as public records are.

I cannot accede to that view. The question we face in the first prong of the qualified immunity analysis is not a complicated one but a very simple one. Because the Sheriff's conduct was so blithely oblivious to the constitutional and statutory protections afforded to the information he sought, we need not consider whether probable cause would have justified his acting without a warrant, or whether the Sheriff would have needed probable cause plus exigent circumstances for justification, to cite but one example of circumstances that could make this case less clear. This case is crystal clear. Against the protections afforded by the Constitution, the Sheriff can rely only on the fact that he had no improper motive. If this was not a constitutional violation, then intimate personal information contained in medical records is not protected by the Constitution and our precedents to the contrary are meaningless.

The majority concludes that one statement from one very different case is dispositive here. In *Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005), we considered whether an assistant district attorney and her supervisor were entitled to qualified immunity for their role in advising law enforcement in the

preparation of a "motion and order" to produce the plaintiff's pharmaceutical records. In the course of determining that the attorneys were entitled to qualified immunity at the second step of the analysis, our court observed – in what appears to be nothing more than *obiter dictum* – that it had not been settled whether a warrant was required to obtain the records. *Id.* at 1103.[15]

The majority is plainly wrong to say that this *dictum* addresses "the" issue presented in the instant case and that the *dictum* concerns "the very circumstances we now face . . . ." Maj. op. at 20.[16] First, the dictum addresses pharmaceutical records, not psychiatric records, and it is the latter that have been the subject of our prior cases. Further, as I have already said, the instant case requires us to consider whether privileged medical information can be obtained by law enforcement without a warrant *or any other justification other than a suspicion that perhaps a crime may have been committed*. It may be unclear whether a warrant is required. But the possibility that Sheriff White's conduct could have been justified on some basis other than the existence of a proper search warrant – for example by probable cause plus exigent circumstances – has but minimal

[15]In *Douglas*, law enforcement had acted on information that the plaintiff's physician suspected plaintiff was forging prescriptions. Moreover, we noted that law enforcement was acting under the authority of a state statute. *Id.* at 1102, n.3.

[16]Given that *Douglas* twice cites a state statute that appears to authorize the conduct of law enforcement there, I do not understand the majority's description of the *dictum* as addressing the necessity *vel non* of a warrant "in the absence of such a statute . . . ."

relevance to our inquiry here because of the extremely thin justification for the Sheriff's conduct here.

The majority says that the question whether a constitutional violation occurred here is further complicated by the "role of third[-]party doctrine." Maj. op. at 21. I do not think that the there is any complication here. Our cases on the constitutional protection afforded to intimate personal information contained in medical records, discussed more in Part II-B, *infra*, afford no role to third-party doctrine, nor have we recognized in those cases that *United States v. Miller*, 425 U.S. 435 (1976), a case regarding bank records, has any relevance.

One case cited by the majority is of more immediate interest, however, because it provides a useful comparison. In *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), the court addressed the good-faith exception to the warrant requirement of the Fourth Amendment, which involves a standard similar to the qualified immunity standard. At issue in the case was the government's acquisition of the criminal defendant's electronic mail from his internet service provider. The government relied on the authority of a statute to support its argument that law enforcement officers had acted in objective good faith. The court held that the government could not rely on the statute if its officers had exceeded the scope of the authority granted by the statute. *Id*. at 289.

In the instant case, both in the district court and on appeal, Sheriff White has relied on a provision of the Federal Privacy Act. The district court rejected

that argument, finding that the provision authorizing sharing of information between agencies applied only to federal agencies, and so could not authorize Sheriff White's actions here. 707 F.Supp.2d at 1257-59. I agree with that conclusion. Moreover, the district judge *sua sponte* considered whether the Sheriff's conduct might have been permissible under the Health Insurance Portability and Accountability Act, Pub. L. 104-191 (HIPAA), and concluded that it was not. The lack of statutory authority for the Sheriff's acquisition of Plaintiff's medical records leaves Plaintiff's privacy expectation undiminished and underscores the unlawfulness of Sheriff White's acts.

The majority says that "the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." Maj. op. at 27, n.5. But we need not here decide the *scope* of the protection, only its *existence*. This case is about whether the protection is real or only illusory, because if the Sheriff did not violate Mr. Kerns's rights by acquiring his medical information based on nothing more than a desire to investigate whether a crime had been committed, there is no protection at all.

We should not hesitate to declare the obvious: Courts have for decades recognized a constitutionally protected right of privacy in the highly personal information contained in medical records, and law enforcement therefore must

-16-

have something more than merely a legitimate investigatory interest in the protected information to justify invading that privacy.

## B

I am convinced that the district court was correct to hold that Sheriff White's actions violated Jason Kerns's clearly established right to have his highly personal medical information protected from a law enforcement officer whose access to that information was supported only by a generalized interest in whether a crime *might* have occurred. As discussed *infra*, existing law certainly gave the Sheriff fair notice that his conduct was unlawful. I believe the majority errs in effectively holding that the right to privacy in medical records cannot be "clearly established" absent an affirmation of the right in some prior case with factual circumstances that differ only trivially.

As Judge Posner has aptly and succinctly noted in pointing out that denial of qualified immunity can be proper even absent an earlier factually identical case, "The easiest cases don't even arise." *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990). This is a pertinent maxim when applied to Sheriff White's actions. Sheriff White's asking the VA for Mr. Kerns's private medical records in the circumstances existing here is so far out of the realm of constitutional behavior that we should not hesitate to hold that it was unlawful, even if we did not have precedents closely on point that mandate that result. But the precedents that do exist are easily close enough on point that any reasonable

-17-

law enforcement officer would have known that constitutionally protected medical records cannot be obtained simply because a possibility exists that the information would be helpful. Constitutional protection means that such records cannot be routinely obtained without a warrant, without consent, without probable cause, and without exigent circumstances.

We have recognized for at least 25 years that the type of intimate, personal information contained in medical records is protected under the Constitution. *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986). In *Mangels* we said that information "is constitutionally protected when a legitimate expectation exists that it will remain confidential while in the state's possession." *Id.* We noted specifically there that medical records are within the ambit of this protection. *Id.* (citing *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980)). We acknowledged in *Flanagan v. Munger*, 890 F.2d 1557, 1570 (10th Cir. 1989), that judicial recognition of the "constitutional right to privacy [which] protects an individual's interest in preventing disclosure by the government of personal matters" goes back at least to *Whalen v. Roe*, 429 U.S. 589, 599 & n.24 (1977).

Psychiatric records have been afforded even greater protection. The Supreme Court has held that an evidentiary privilege exists to protect the "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment" under Fed. R. Evid. 501. *Jaffee v.*

-18-

*Redmond*, 518 U.S. 1, 15 (1996). Two years after that, we vacated a criminal conviction that had been based on statements made by the defendant to his psychiatrist, holding that the district court had failed to determine whether the privilege could have been overcome in the circumstances. *United States v. Glass*, 133 F.3d 1356 (10th Cir. 1998).

The Supreme Court has taught that the "reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent." *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001). Long before *Ferguson*, this court had recognized the fundamental principle that medical records contain very personal and private information and are entitled to constitutional protection. *See, e.g., Lankford v. City of Hobart*, 27 F.3d 477 (10th Cir. 1994).

Here, however, Sheriff White obtained Jason Kerns's very private medical records without any recognition that those materials were constitutionally protected. If law enforcement may obtain medical records as easily as they can request publicly available information, as was done here, then the special privacy protection extended to our medical records by the Constitution is rendered meaningless. I therefore disagree with the majority's dismaying conclusion, *see* Maj. op. at 18-25, that Mr. Kerns did not enjoy a clearly established right to have his VA medical records kept private from law enforcement authorities who were

-19-

acting without a warrant, without consent, without probable cause – indeed, acting only on mere suspicion that a crime possibly may have been committed, and in the absence of any exigent circumstances.

In considering whether Sheriff White's conduct violated clearly established law, we must not engage in a "scavenger hunt for prior cases with precisely the same facts" but should instead focus on "the more relevant inquiry," whether the existing law gave Sheriff White "fair notice" that his conduct was unconstitutional. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). "[T]here need not be precise factual correspondence between earlier cases and the case at hand, because 'general statements of the law are not inherently incapable of giving fair and clear warning . . . .'" *Anderson v. Blake*, 469 F.3d 910, 913-14 (10th Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Yet the majority goes on to highlight factual distinctions from prior cases as it defends its holding that Plaintiff's rights were not so clearly established that a reasonable law enforcement officer would have known that his conduct violated those rights. I would adhere to the patently clear principle that individuals have a constitutional right to have their medical records kept private from law enforcement officers pursuing general investigative ends and acting in the absence of any authority to breach that privacy. *See Ferguson v. City of Charleston*, 532 U.S. 67 (2001); *Lankford v. City of Hobart*, 27 F.3d 477 (10th Cir. 1994); *A.L.A. v. West Valley City*, 26 F.3d 989 (10th Cir. 1994).

Like the district judge in this case, I believe our cases gave more than "fair notice" that the constitutional protections afforded private medical records require law enforcement to show more than that the records could possibly include evidence of a crime. A reasonably competent law enforcement official must be held to know that it means *something* that medical information has for years been afforded privacy protection under the Constitution.

In *Lankford v. City of Hobart*, 27 F.3d 477 (10th Cir. 1994), the court considered the section 1983 claims of two dispatchers of the Hobart Police Department. One of these women, Ms. Calvary, had alleged that the former police chief, Mr. Medrano, had "used his authority as chief of police to obtain Ms. Calvary's private medical records without her consent from a local hospital in an attempt to discredit her or to prove his statements that she was a lesbian." 27 F.3d at 478. We held that the district court had correctly ruled that Ms. Calvary had pleaded the *violation of her well established right to privacy in her medical records*, reasoning that *"there is no question that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection." Id.* (emphasis added; citations and internal quotation marks omitted). And in a second case decided over seventeen years ago we recognized that *"[t]here is no dispute that confidential medical information is entitled to constitutional privacy protection." A.L.A. v. West Valley City*, 26 F.3d 989, 990 (10th Cir. 1994) (emphasis added).

-21-

Thus, at least eleven years before Sheriff White obtained Plaintiff Jason Kerns's medical records, we had held that similar conduct violated well established rights. The majority, however, is unpersuaded that cases like *Lankford* are sufficient to satisfy the second prong of the qualified immunity test. This is because, we are told, "most" of the cases cited by Plaintiff Jason Kerns involved police publicly disclosing the private information rather than obtaining it for law enforcement efforts. Maj. op. at 24.

The majority errs by relying on this claimed distinction. In *Lankford*, for example, we determined that the thrust of Ms. Lankford's claim was that the defendant had "*seized and reviewed* her private medical records." 27 F.3d at 479 (emphasis added). That the cases protect the individual from having his private medical records "seized and reviewed" – and not just from having those records publicly disclosed – is only reasonable because, after all, what is at stake here is intimately personal information. I think most Americans would not be comforted to think that the police could freely peruse their most private medical files so long as they did not pass the information along to the general public. Thus, I think the majority is quite wrong to attempt to distinguish *Lankford* and similar precedents on this basis.

Nor am I convinced that the qualified immunity defense should prevail here on the ground that Sheriff White sought the information for law enforcement purposes. An objectively reasonable law enforcement officer must know that not

-22-

all methods are open to him in pursuing his legitimate law enforcement interests. Sheriff White had fair notice that constitutional protections afforded to individuals' private medical records restrict the ambit of police actions. Nonetheless, Sheriff White proceeded as if Jason Kerns's medical records were entirely unprotected.

As noted, Plaintiff Jason Kerns bases his section 1983 claim against Sheriff White on both the Fourth and the Fourteenth Amendments to the Constitution. Because Jason Kerns enjoyed a due process right to the non-disclosure of his personal medical information, the infringement of that right implicates the Fourth Amendment. *See, e.g., Douglas v. Dobbs*, 419 F.3d 1097, 1103-04 (10th Cir. 2005) (Tymkovich, J., concurring). In the Fourth Amendment context, Plaintiff relies heavily on *Ferguson v. City of Charleston*, 532 U.S. 67 (2001). The majority attempts to confine *Ferguson* to very narrow contours*,* and its characterization of *Ferguson* is unduly limiting. *Ferguson* did note that in some circumstances statutes may require medical providers to release information from their patients' files. Neither the majority nor Sheriff White identifies any such statute which applies in this case. The district court nevertheless considered whether the VA hospital might have been authorized to release Plaintiff's records under the law enforcement exception to the Health Insurance Portability and Accountability Act, Pub. L. 104-191 (HIPAA). The district judge concluded that the law enforcement exception did not apply to the Sheriff's request, 707

-23-

F.Supp.2d at 1259, and I agree. The absence of statutory authority in this case leaves Jason Kerns's privacy expectation undiminished and underscores the unlawfulness of Sheriff White's conduct.

Thus the majority's treatment of *Ferguson* does not withstand scrutiny. *Ferguson* reinforced the principle that the Fourth Amendment *does* protect patient records from warrantless searches without probable cause or other justification. *Ferguson* simply added to the existing body of law which constitutes fair warning that a law enforcement officer seeking to obtain constitutionally protected medical records must comply with the Fourth Amendment. "[A] general constitutional rule that has already been established can 'apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Anderson v. Blake*, 469 F.3d 910, 917 (10th Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. at 741).

Sheriff White points out that he asked the VA to provide the records to him, presumably instead of going into the VA's files and taking the records himself. This is a distinction without a difference. The Supreme Court long ago established that the police cannot breach one's constitutional rights simply by asking another person to do it for them. *Stoner v. California*, 376 U.S. 483 (1964). On the record before us, the VA hospital lacked any authority — apparent, express, or implied — to waive Mr. Kerns's constitutional right to privacy in his medical records. Sheriff White's liability is not absolved by asking

an unauthorized individual to disclose the protected records instead of procuring the records himself. Sheriff White was on notice that medical records are private and that the Constitution constrains law enforcement efforts to acquire such information. As Thomas Jefferson asserted long ago: "In questions of power, then, let no more be said of confidence in man, but bind him down from mischief by the chains of the Constitution."[17]

In sum, Sheriff White is not entitled to immunity from responsibility for his actions. I respectfully but most emphatically dissent from the majority's reversal of the district court's proper denial of Sheriff White's motion for summary judgment.

## C

Deputies Lindley and Koren are appellants in No. 10-2103 along with Sheriff White. The issues raised by them, and the factual background for those issues, have almost nothing in common with the issues raised by Sheriff White. Instead, Deputies Lindley and Koren, like the appellant in No. 10-2106, Mr. Haag, are sued for false arrest and false imprisonment based on their participation in the investigation that culminated in the arrest of Jason Kerns and his detention for almost nine months before the charges against him were dropped because of

---

[17] 4 *Debates in the Several State Conventions, on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787* 540, 543 (Jonathan Elliot, 2d ed. 1891) (reprinting the Kentucky Resolutions of 1798 and listing Thomas Jefferson as author of the draft resolutions).

insufficient evidence. For convenience, I will address the appeal of Deputies Lindley and Koren in the next section, along with the appeal by Mr. Haag.

## III. *Appeal No. 10-2106*

This appeal is brought by Mr. Michael Haag, a ballistics expert who participated in the investigation and testified before the federal grand jury that indicted Plaintiff Jason Kerns. As just noted, I will also discuss here the appeal by Deputies Lindley and Koren, who are actually appellants in No. 10-2103.

### A

As to Deputies Lindley and Koren, the majority opinion provides a sketch of some of the relevant facts.[18] I will mention some of the other evidence that was presented to the district court and relied upon to support that court's rulings.

As to Deputy Koren, his role in the investigation included trying to determine the location of the shooter when the helicopter went down. To do that, Deputy Koren tried to determine the altitude of the helicopter at the time it had been hit and the direction that the helicopter had been facing. Then he attempted to ascertain the trajectory of the bullet. Koren attempted to determine the trajectory by drawing a line between the point where the bullet entered the helicopter and one of the aircraft's foot pedals, which had also been hit by the bullet. Koren did not, however, know how the pedals had been positioned at the

---

[18]As with every other aspect of these appeals, the facts are set out in much greater detail in the district judge's very thorough opinion published at 707 F. Supp.2d 1190.

time. It appears that the pilot was unavailable to assist in the first stages of the investigation, presumably as a result of his hospitalization for treatment of injuries he sustained from bullet fragments and from the crash landing. In any event, Koren simply assumed, or guessed, that the pedals had been in the "neutral" position and based his trajectory analysis on that guess, which turned out to be wrong. Koren's conclusion was that the rifle shot had come from approximately 1630 feet, as measured on the ground. Later analysis by Mr. Welch, an expert retained by Jason Kerns, used information from the pilot as the basis for the position of the foot pedals at the time the helicopter was shot and led to the conclusion that the shot had come from a distance of about 939 feet. The district judge held that a jury could find that Koren had been reckless in his trajectory analysis.

Jason Kerns also submitted evidence to show that the GPS data recovered from the crashed helicopter showed that it had not been facing the Kerns's residence at the time it was shot down, a fact that he alleged had been recklessly omitted from the affidavit in support of the arrest warrant. This fact is significant because the rifle shot entered the helicopter from the front, and almost directly from the front it appears. If the helicopter were not facing the Kerns's property, then the information in the affidavit that tended to incriminate Jason Kerns based on the trajectory analysis added nothing to the probable cause analysis.

Deputy Lindley was responsible for gathering information from others involved in the investigation and for drafting the affidavit in support of the application for an arrest warrant. The district judge held that a jury could find that Lindley had been reckless in his "adoption of the most favorable of Haag's conclusions" (which are discussed below), based on the fact that Lindley had omitted statements by Haag that would have limited the conclusions Haag had reached. For example, in relating Haag's (erroneous) conclusion that the bullet fragments recovered from the helicopter could have been fired from one of Jason Kerns's rifles, Lindley omitted Haag's statement that the bullet could also have come from any of a number of other makes of rifles available on the market. Moreover, as discussed *infra*, Haag's analysis was shown to have been unreasonable, and Haag himself withdrew his opinion upon reviewing the opinions of Plaintiff Jason Kerns's expert, Mr. Welch.

As the majority correctly notes, when false statements have been included in an arrest warrant affidavit due to recklessness or malice, our task is to determine whether the remaining facts in the affidavit are sufficient to establish probable cause. Maj. op. at 28. And when facts have been improperly omitted from an arrest warrant affidavit, we include those omitted facts in making the probable cause determination. *Id.* The district court recognized these principles in its analysis, and in my view reached the correct conclusion that probable cause was not established for the arrest of Jason Kerns.

-28-

The arrest warrant affidavit is based on the theory that Jason Kerns shot down the helicopter from a location within a few feet of his parents' property line. There is simply no other reason for including the flawed analysis which estimated that the shot had been fired from about 1630 feet away, while the helicopter at the time had been about 1670 feet from the Kerns's home. But if the affidavit had said that the helicopter had been facing away from the Kerns's home when it was hit in the front, the distance from the Kerns's home would have been irrelevant. And if the affidavit had disclosed that the trajectory analysis had been based merely on Koren's guess as to the position of the foot pedals at the time the bullet entered the aircraft, that analysis would lack probative value as well.

Thus the hypothetical affidavit that results from our omitting wrongfully included information and including wrongfully omitted information is self-contradictory. I would hold that such a hypothetical affidavit would be insufficient to establish probable cause.

Even the incident in which Jason Kerns tried to elude surveillance, while probative, deserves little weight in light of the fact that the affidavit reflects that the officers were in an unmarked vehicle. Trying to evade an unmarked police car is not, I think, as indicative of guilt as trying to avoid a uniformed officer or a marked car.[19]

_____

[19]Our analysis must be limited to the facts recited in the affidavit for the arrest warrant, as the majority apparently recognizes in its general description of

(continued...)

Further, as we consider Deputy Lindley's role, we must consider additional information that was wrongly omitted from the affidavit.[20] This includes the fact that Mr. Haag's ballistic analysis, flawed as it was, had concluded that the bullet fragments recovered from the helicopter could have been fired from one of Jason Kerns's rifles or from any of a number of other rifles readily available on the market.[21] Because I conclude (in considering Deputy Koren's appeal) that probable cause is not shown even before adding this omitted information, I certainly would hold that Deputy Lindley cannot show that probable cause was established in spite of his errors, including the omission of Mr. Haag's statement about the number of rifles on the market that could have fired the shot.

---

[19](...continued)
its approach on appeal. Maj. op. at 26. The majority thus errs by relying on Jason Kerns's later admission that he believed the car following him was probably a police car, a fact that was disclosed in discovery in this case and was not mentioned in the affidavit.

[20]Throughout this discussion I refer to wrongly included or wrongfully excluded information. A jury could determine, as the district judge correctly noted, that the errors of Lindley and Koren were due to mere negligence, not to recklessness or intent to deceive. For our purposes, however, we consider only the legal consequences of a possible jury determination that the deputies' conduct was reckless or worse.

[21]I believe that Deputy Lindley was entitled to rely on Mr. Haag's analysis, although of course he was not entitled to distort it. Thus although as explained *infra* we must, in considering Mr. Haag's appeal, assume that Jason Kerns's rifle had been conclusively excluded, the reasons for that treatment do not apply to Deputy Lindley.

Therefore, I would affirm the district court's denial of qualified immunity to Deputy Lindley and Deputy Koren.

**B**

Mr. Haag is a civilian employee of the City of Albuquerque who works in the firearm and toolmark unit of the city's forensic science center. Mr. Haag is a respected member of a national professional group, the Association of Firearms and Toolmark Examiners (AFTE). Under the group's standards for ballistics examinations, there are four conclusions that can be reached: (1) identification, (2) inconclusive, (3) elimination, and (4) unsuitable. "Identification" is a conclusion that the tested bullet fragment, for example, matches the characteristics of the weapon under consideration. In this case, Mr Haag concluded that the shell casing wrapped in tape that had been found in the trash at the Kerns's residence was identified as having come from Jason Kerns's FN rifle.[22]

"Inconclusive" means that the examiner can neither identify the fragment as being from the subject gun nor can he exclude the possibility that it was. Mr. Haag concluded that the fragments he examined that had been taken from the helicopter and from the pilot's leg could neither be identified nor excluded as

_____

[22]Mr. Haag had determined from trace evidence he observed in the helicopter that only a high-powered rifle could have fired the shot. In the search of the Kerns's residence, officers had recovered three high-powered rifles. Mr. Haag quickly eliminated two of them and thereafter focused on the rifle that is referred to herein as the FN rifle.

having come from the FN rifle. His conclusion was, therefore, "inconclusive." Mr. Haag advised Deputy Lindley of this conclusion and also testified to the grand jury about it. Mr. Haag opined in his report and his grand jury testimony that the bullet fragments could have come from the FN rifle as well as from many other firearms available on the market.

Plaintiff Jason Kerns retained his own ballistics expert, Mr. Welch. Mr. Welch testified that, upon using a microscope to compare the first bullet fragment to a bullet that had been test-fired from Plaintiff's FN rifle, the first step of his analysis, it took him only five seconds to conclude that the FN rifle should have been eliminated as the source of the fragments that had been recovered from the crash. Mr. Welch testified that Mr. Haag was recognized in the field as a competent examiner and that he, Welch, personally had reviewed some of Mr. Haag's work before and had never disagreed before with one of Mr. Haag's conclusions. In this case, however, Mr. Welch testified that he could not comprehend how Haag had reached a different conclusion: "It just boggles my mind." The two examined projectiles were "grossly different." Welch opined that it was "reckless disregard of the facts" for Haag to disregard the gross discrepancies between the fragments recovered from the helicopter and the bullet that had been test-fired from the FN rifle.

The district judge, taking the evidence in the light most favorable to Jason Kerns as the non-movant, held that a reasonable jury could find that Mr. Haag's

decision not to exclude the FN rifle "rose to the level of reckless disregard." 707 F. Supp.2d at 1279. The judge further held that a reasonable jury could also find "intent." *Id.*

Before proceeding to the probable cause analysis that we must undertake on the assumption that the affidavit should have declared that the FN rifle had been eliminated, I mention one further point on which I disagree with the majority. This has to do with the tape-wrapped shell casing that had been found in the Kerns's trash. Mr. Haag had concluded that this shell casing had been fired from the FN rifle, and that conclusion has never been questioned. The majority says that this bit of evidence helps to support a determination of probable cause – even when considered with the fact that the affidavit should have reflected that the FN rifle had been excluded – because it supposedly showed that Jason Kerns had something to hide. This is singularly unpersuasive to me. No motive for hiding an object that could not have been incriminating is suggested.

What is left in the arrest affidavit after omitting the faulty ballistics analysis is, in my view, inadequate to establish probable cause even if sufficient to have aroused the officers' suspicion. The affidavit for arrest warrant reflects that Jason Kerns rushed to the scene of the crash and offered his observations. The affidavit reflects that several other witnesses also said that they had heard a gunshot, and a fair inference is that their information, like Mr. Kerns's, was not sufficiently accurate to permit the investigators to determine the location of the

shooter. Even the incident in which Kerns tried to elude surveillance, while probative, is not of much weight, as I have noted *supra*. Therefore, I believe that the majority errs when it concludes that it would not have made a difference if Mr. Haag had excluded the FN rifle. I acknowledge that the affidavit contains some inculpatory material and those facts would have justified further investigation of Jason Kerns. But I do not agree that such material established probable cause for his arrest.

A law enforcement expert may not take reckless liberties with the truth or lie intentionally and be immune from the consequences. *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004). Qualified immunity does not protect the dishonest state actor. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[T]he qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

In sum, then, I conclude that the arrest and prosecution of Jason Kerns would not have been supported by probable cause absent the faulty analysis by Mr. Haag. We lack jurisdiction to review the district court's holding that a reasonable jury could find that Mr. Haag's errors were the result of reckless disregard for the truth. If a jury were to make that finding, it would be justified under *Pierce v. Gilchrist* in holding Mr. Haag liable for his conduct. Therefore, I would affirm the district court's denial of immunity to Mr. Haag.

### *Conclusion*

Accordingly, I respectfully dissent.[23]

---

[23]A number of issues raised by the parties were not reached in the majority opinion because the majority's disposition effectively mooted them. I have not attempted in this dissent to reach every such issue.